UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| In re:<br><br>ZACHARY L. ALLEN, II<br><br>    Debtor. | Chapter 7<br><br>Case No. 20-42663 |
| In re:<br><br>TIARA C. DONEGAN<br><br>    Debtor. | Chapter 7<br><br>Case No. 20-42689 |
| DANIEL J. CASSAMATA,<br>Acting United States Trustee,<br><br>    Movant<br>v.<br><br>WILLIAM H. RIDINGS, JR.,<br><br>    Respondent. | Hon. Barry S. Schermer<br><br>Hearing Date: November 4, 2020<br>Hearing Time: 2:00 p.m.<br>Location: 111 South 10th St.<br>      Courtroom 5 North<br>      St. Louis, MO 63102 |

**DEBTORS' COUNSEL'S CONSOLIDATED RESPONSE AND OBJECTION TO THE UNITED STATES TRUSTEE'S MOTIONS FOR EXAMINATION OF THE FEES OF DEBTOR'S ATTORNEY PURSUANT TO 11 U.S.C. § 329, FEDERAL RULE OF BANKRUPTCY PROCEDURE 2017, AND LOCAL RULE 2093**

   William H. Ridings, Jr. and his firm, Ridings Law Firm LLC (collectively, "Counsel") provide the following response and objection to the "United States Trustee's Motion for Examination of the Fees of Debtor's Attorney Pursuant to 11 U.S.C. § 329, Federal Rule of Bankruptcy Procedure 2017, and Local Rule 2093" (the "Motion" or "Motions") filed in each of the above-captioned Chapter 7 cases (hereinafter, individually the "Allen Case" and "Donegan Case" and, collectively, the "Cases"). For the reasons set forth below, Counsel urges the Court to deny the Motion in each of the Cases.

**I.      INTRODUCTION**

The Motions challenge Counsel's use of a bifurcated engagement structure to offer his clients the option of making installment payments of counsel's post-petition fees in these chapter 7 Cases.[1] More specifically, the Motions raise two, specific arguments: first, that the agreements violate Section 329 of the Code because the fee Counsel charged "exceeds the reasonable value of the services to be rendered;" and second, that the agreements "unbundle the services" in violation of Local Rule 2093(C)(3). Neither argument is persuasive and the Motions should be denied.

The UST incorrectly applies controlling Eighth Circuit (and Supreme Court) law concerning reasonability of fees to the facts of the Cases, despite conceding that the actual fee charged in each Case is not "unreasonable per se in a case such as this one." Motion, ¶ 29 (in both Cases). The UST focuses instead on the characterization that there is an "upcharge" between the options that Counsel presented to each debtor—a prepaid fee and a higher fee paid over time—to argue that the higher, pay-over-time fee is unreasonable. The law requires the Court to look simply at the fee actually charged—which the UST concedes is reasonable—to satisfy § 329.

Likewise, the UST incorrectly argues that this Court's local rule prohibiting limited-scope engagements is violated by a bifurcated chapter 7 engagement. The engagement

---

[1] Bifurcation is the process of entering into separate fee agreements for the pre-petition and post-petition work necessary to represent a consumer in a chapter 7 bankruptcy. It is utilized in order to minimize the up-front financial burden to a debtor to hire counsel, and to allow the debtor to make installment payments for their post-petition attorney fee. See, e.g., In re Carr, No. 19-20873 (Bankr. E.D. Ky. Jan. 22, 2020) (approving bifurcation); In re Hazlett, No. 16-30360 (Bankr. D. Utah April 10, 2019) (same); In re Slabbinck, 482 B.R. 576 (Bankr. E.D. Mich. 2012) (same); Walton v. Clark & Washington, P.C., 469 B.R. 383 (Bankr. M.D. Fla. 2012) (same); Garrison, Daniel E., "Liberating Debtors from the 'Sweatbox' and Getting Attorneys Paid: Bifurcating Consumer Chapter 7 Engagements," *ABI Journal* Vol. XXXVII, No. 6 (June 2018).

agreements here do not, however, contemplate a limited-scope engagement; they in fact contemplate a full engagement (which, obviously, is what has actually happened in these Cases). A sensible consideration of the local rule and the practice of bifurcation reveals that they serve exactly the same purpose: promoting full representation of debtors through the chapter 7 process.

II.     **GENERAL RESPONSE TO ASSERTED FACTS**

In general, Counsel concurs in the UST's explication of the organic facts related to these matters, which are concisely and accurately represented in the Motion filed in each of the Cases. Counsel is troubled, however, by the UST's paraphrase and characterization of testimony given by the debtors during their Section 341 Meetings. Counsel did not have an opportunity to prepare the debtors for the UST's interrogation, nor to refresh recollections, refer to exhibits, or any of the other procedural protections typically afforded in formal examinations. To the extent that certain issues raised by the UST may require the Court to adjudicate facts, Counsel should be given the opportunity to adduce testimony in a more structured—and consequently more fair—environment. In particular, any question of informed consent by the debtors, or reasonability of Counsel's fees, should require an evidentiary hearing.

III.    **LEGAL ANALYSIS**

   A.   Utilizing the Controlling Lodestar Standard, Counsel's Fees Are Reasonable Under Section 329 of the Code.

Counsel's fee in each of the Cases is eminently reasonable—an overarching fact that the UST seems to recognize—and the UST's argument that Counsel's engagements should be voided because of a supposed "upcharge" for a bifurcated engagement misunderstands and misapplies the law. Reasonableness for purposes of Section 329 is determined with reference to the standard imposed by Section 330. See, e.g., Am. Law Ctr., PC v. Stanley (In re Jastrem), 253 F.3d 442, 443 (9th Cir. 2001) (invoking § 330(a)(3) in review of § 329(b) order). Under Section

3

330, the bankruptcy court must "consider the nature, the extent and the value of such services, taking into account all relevant factors," including a specific list of six considerations. 11 U.S.C. § 330(a)(3).  In the Eighth Circuit, "[t]he lodestar method, calculated as the number of hours reasonably expended multiplied by a reasonable hourly rate, is the appropriate calculation of fees." Stalnaker v. DLC, Ltd., 376 F. 3d 819, 825 (8th Cir. 2004) (citing Chamberlain v. Kula (In re Kula), 213 B.R. 729, 736 (B.A.P. 8th Cir. 1997)).

      The Supreme Court has strongly embraced the lodestar standard for determining a reasonable attorney fee precisely because it "is readily administrable," and "cabins the discretion of trial judges, permits meaningful judicial review, and produces reasonably predictable results." Perdue v. Kenny A., 559 U.S. 542, 130 S.Ct. 1662, 1672 (2010). In order to conduct a lodestar analysis, a trial judge must determine "the prevailing market rates in the relevant community," because the test was "[d]eveloped after the practice of hourly billing had become widespread." Id. The lodestar method thus produces an award that an "attorney would have received if he or she had been representing a paying client who was billed by the hour in a comparable case."  Id.

      The UST instead focuses all of its attention on the $500 differential between Counsel's pre-paid flat fee, and his pay-over-time flat fee. Paradoxically, the UST notes that "the amount that the Debtor is paying for the services of Mr. Ridings is approximately $1,165," which the UST "does not contend . . . is unreasonable per se in a case such as this one, a routine chapter 7 bankruptcy case involving a consumer debtor." Motion, ¶ 29 (in both Cases). Instead, the UST contends that "[t]he fee the Debtor is paying is unreasonable because it includes a $500 upcharge simply because he could not pay the entire amount of the fees to Mr. Ridings pre-petition and because the agreements providing for this fee unbundle the legal services of Mr. Ridings, in

4

violation of Local Rule 2093(C)(3)." Allen Motion, ¶ 29; see Donegan Motion, ¶ 29 (verbiage different only in use of female pronoun).

Fortunately, under the lodestar test what a chapter 7 attorney charges for a prepaid chapter 7 has no bearing on what is reasonable under Section 329 when a debtor is allowed to pay over time. The appropriate focus is on the lodestar value of the fee *actually charged*, not on what was offered to the debtor but not chosen, and not practically available to that debtor due to their circumstances. Cf., In re Hazlett, No. 16-30360 at 2, 21 (Bankr. D. Utah April 10, 2019) (a copy of which is attached hereto as Exhibit "A") (attorney's $2000 post-petition fee in a bifurcated case deemed reasonable despite being nearly double the $1,200 prepaid fee that a competitor offered to the same debtor).

The UST's primary authority for this flawed approach is a bankruptcy court decision that is currently on appeal (a fact that the UST conveniently omits in its citation). See In re Milner, 612 B.R. 415 (Bankr. W.D. Okla. 2019) (appeal pending, Sisson v. United States Trustee, Civ. No. 5:20-cv-00033-PRW (W.D. Okla.)). The UST also cites to a recent, unpublished decision of the bankruptcy court in the District of Minnesota, In re Ryan, No. 19-33190 (Bankr. D. Minn., Sept. 30, 2020). A certified transcript of the Ryan decision (which the court chose to read into the record rather than to issue as a memorandum opinion) is attached hereto as Exhibit "B" (hereinafter, the "Ryan Decision"). The UST mischaracterizes the Ryan Decision as concluding that attorney's fee should be reduced because of a differential between the prepaid and pay-over-time flat fees, but that simply is untrue. In the Ryan Decision, the court accepted the lodestar test as the controlling standard, looked at counsel's breakdown of the average time spent on post-petition tasks, and reduced the fee to the total for the post-petition tasks actually performed without giving any credit for tasks that the attorney committed to perform but that may or may

5

not have been needed. See Ryan Decision at 45 (Counsel's attorney in this matter was counsel for the debtors' attorneys in both the Milner and Ryan cases).

And, in fact, there are good reasons for there to be a difference in the fee. As the UST notes in the Motions, Counsel's fee disclosures to the Court explain the different work, risks and costs associated with both bifurcating the engagement, and using a third-party financing company to accommodate the client's inability to prepay a fee. See Motion, ¶ 8. Similar explanations exist in the client agreements, as well.

Moreover, it is ethically permissible to pass on a financing charge when a client is aware of it and gives their informed consent, so long as the overall fee is reasonable.

> Some clients may be unable to afford lawyers' fees absent some form of accommodation or assistance. For example, a criminal defense or family law client may be unable to afford a lawyer's flat fee at the outset of a representation. The client may be able to afford the lawyer's fee, however, if the client can finance the fee through a loan from a third-party. Or, a client may simply wish to finance a lawyer's fee rather than pay a lump sum.

Formal Opinion 484, ABA Standing Committee on Ethics and Professional Responsibility, at 1. The use of third-party financing does not implicate fee-sharing, and the attorney's cost of financing can be passed on to a client with adequate disclosure and so long as the overall fee remains reasonable. Id. at 10-11.

But the "bottom line" from a legal perspective is clear: if the total, flat fee of $1,165 is reasonable compared to the hourly value of Counsel's time spent on post-petition work, it satisfies Section 329, regardless of what costs and considerations led Counsel to set his fee at that level. At $250 per hour (which the UST notes is Counsel's ordinary, hourly rate) it only requires 4 2/3 hours of Counsel's time (or some combination of his and his assistant's time at $120 per hour) to justify the total fee. While this clearly is a factual matter that will have to be developed, it should not be hard for this Court to conceive that this amount of time is spent on

6

every chapter 7 case, no matter how simple. What's more, it would run counter to the Court's interest in promoting thorough representation to cabin counsel any more conservatively than this.

      B.  Counsel's Bifurcated Chapter 7 Engagements Do Not Violate Local Rule 2093(C)(3).

Counsel's bifurcated engagement agreements do not violate Local Rule 2093(C)(3) and, in fact, the purpose of bifurcation is completely consistent with the policy basis for the Local Rule. Interpreting them as inconsistent would, in fact, undermine the rationale for prohibiting limited-scope representations.

This Court should find that Counsel's bifurcated engagement complies with the local rule on its face. Local Rule 2093(C)(3) provides, in relevant part, that:

> [D]ebtor's counsel shall provide all legal services necessary for representation of the debtor in connection with the bankruptcy case until conclusion of the case, except for, at the discretion of debtor's counsel, representation of the debtor in an adversary proceeding and/or an appeal, for the fee set forth in the attorney fee disclosure statement filed with the Court Pursuant to L.R. 2016-1(A). "Unbundling" of legal services or any similar arrangement is prohibited, and debtor's counsel shall not include any language in the attorney fee disclosure statement or in a client agreement that contradicts or is inconsistent with this Rule.

The Rule begins by defining the scope of legal services discussed in the Rule as those "necessary for representation of the debtor in connection with the *bankruptcy case*." Id. (emphasis added). The "bankruptcy case" does not exist until *after* the petition is filed. Consequently, the subsequent portion of the rule should be interpreted as governing the engagement agreement that exists during the bankruptcy case which—here—is the post-petition agreement. There is no allegation that the post-petition engagement agreement fails to bind counsel to provide "all legal services" needed for a full representation.

Even if the Court were to look at both the pre-petition and post-petition agreements through the lens of the local rule, the arrangement still complies. "Unbundling" is a colloquial

7

term for a limited-scope engagement, or the idea that an attorney would agree to only provide a portion of the services commonly understood to comprise the "bundle" of assistance associated with a thorough chapter 7 representation. Counsel uses the recommended form of engagement agreement provided by Fresh Start Funding, which explicitly provides that "the Law Firm has expressed that it is ready, willing and able to represent you for your entire chapter 7 case," and that the client is not bifurcating the engagement "with the intention of having the Law Firm simply file your case and then withdraw, but instead to facilitate you making payments over time for your attorney fee so that you can have an attorney represent you through the entire chapter 7 process." As set forth below, this distinction is critical to distinguishing bifurcation from "unbundling."

Not only is bifurcation consistent with this district's local rules, it also serves the same policy purposes behind rules that seek to prohibit limited scope representation. Accordingly, the Court should resolve any perceived ambiguity in favor of finding that bifurcation is consistent with (or at least does not offend) the local rule. This approach keeps with well-recognized principles of statutory construction.

For example, in <u>Reves v. Ernst & Young</u>, 494 U.S. 56 (1990), the United States Supreme Court had to define the phrase "any note" in the definition of "security" to determine whether a creatively structured financial instrument that was denominated a "note" was in fact a regulated security under the Securities and Exchange Act. <u>Id.</u> at 60-61. The Court approached the question from the perspective of Congressional purpose and intent. The Court first observed that Congress had a very broad purpose in the Act, <u>id.</u> at 61, but then postulated that "the phrase 'any note' should not be interpreted to mean literally 'any note,' but must be understood against the backdrop of what Congress was attempting to accomplish in enacting the Securities Act." <u>Id.</u> at 63. Although the Court ultimately concluded that the note under review was a security, it first parsed the language and its purpose to observe that not all notes are securities, even though the definition in the Act listed "all notes." <u>See id.</u> at 60-67. <u>Reves</u> is a case of "latent ambiguity" where apparently

8

simple language could have been interpreted overbroadly, but for the Court's consideration of the public policy behind the language, and a determination of whether a particular conclusion was sensible in view of the rule's intent.

The lesson from Reves is instructive here. While a straightforward reading of the local rule does not appear to prohibit bifurcation, any doubt about that must be resolved with reference to the purpose behind limited scope representation or so-called "unbundling" rules. On that score, the analysis in the leading case on this topic, In re Hazlett, No. 16-30360 (Bankr. D. Utah April 10, 2019), is instructive.[2]

In its discussion of whether bifurcation is legal, the Hazlett court first distinguished bifurcation from "unbundling" or using a limited services agreement. Id. at 14. Observing that the "primary concern with unbundling is that the attorney provides a limited service and then leaves the client to his or her own devices to complete the legal process," the court noted in contrast that "the purpose of the bifurcated agreement is decidedly not to abandon the debtor, but to enable the attorney to be paid for the post-petition services." Id. (internal citations omitted). So, while under a bifurcated arrangement "debtors are given the option to proceed *pro se*," the "decision is solely up to the debtor, as the attorney is ready and willing to complete the representation upon the signing of the post-petition fee agreement." Id. "Thus," the court concluded, "the bifurcated fee agreement is not for unbundling" and "only increases the affordability of the attorney's services and thereby increases a debtor's access to legal representation." Id. at 14-15.

---

[2] Although the Hazlett decision is not the first to approve of bifurcated chapter 7 engagements (see FN 1, *supra*), the decision has been so well regarded as to lead the Director of the United States Trustee Program, Cliff White, to "commend that opinion" to the attention of the National Association of Bankruptcy Trustees at their recent annual meeting because of the "careful reasoning of the court." Clifford J. White, Director, United States Trustee Program, Keynote Address at the Annual Meeting of the National Ass'n of Bankr. Trustees (Denver, Co., August 23, 2019) (published at https://www.justice.gov/ust/speech/remarks-director-cliff-white-2019-annual-conferencenational-association-bankruptcy). Mr. White went on to note that "the court's opinion provides an important four-part analysis in assessing bifurcation practices," and that "[i]t is instructive to the USTP and should be instructive to the bar as well." Id.

9

Even more specifically, the Hazlett court considered and rejected an argument that a bifurcated agreement was contrary to a very similar local rule that prohibited limited scope representations and further provided that "[t]he scope of representation cannot be modified by agreement." Hazlett at 19 (quoting L.R. Bankr. P. 2091-1 (Bankr. D. Utah)). The Hazlett court noted that:

> The intent of this rule is indeed to restrict the use of limited service agreements (unbundling) by debtor's counsel. However, as noted above, the difference with Capstone's bifurcated agreement procedure is that the law firm is willing to complete the representation, and it is only by the debtor's election that the case proceeds pro se. Debtors are free at any time to terminate a lawyer's services, so the Court does not see the use of bifurcated fee agreements as creating the problem addressed by Local Rule 2091-1.

Id. It should not escape this Court's attention that Counsel's agreements contain this same representation, as well as an additional one that the client is not using the bifurcated structure to limit the representation. This Court should accordingly reach the same conclusion as the Hazlett court did.

The Slabbinck decision (also cited in footnote 1, *supra*) similarly concluded that limited-scope rules and bifurcation serve the same purposes. See In re Slabbinck, 482 B.R. 576 (Bankr. E.D. Mich. 2012). The Slabbinck court considered a UST argument that the bifurcated engagement constituted impermissible "unbundling" of services in violation of the Michigan rules of professional conduct, concluding (after an exhaustive review of case law and the Michigan ethical rules) that a debtor could agree to split the engagement between two agreements with adequate disclosure. Id. at 583-89. Summarizing its conclusion, the Slabbinck court noted:

> a pre-petition agreement to pay an attorney gives rise to a dischargeable debt. A post-petition agreement does not. For the Court to insist on an all or nothing approach, in the name of promoting attorneys' competence, will have the perverse effect of depriving needy individual debtors who cannot afford to pay in advance for *all* of the legal services they may need in an a Chapter 7 case, from hiring an

        attorney to provide them with *any* of the legal services that they may need in a
        Chapter 7 case.

Id. at 597. For the Slabbinck and Hazlett courts, finding that bifurcation violated "unbundling" rules would be akin to "throwing out the baby with the bath water."

      In short, the purpose behind so-called "unbundling" rules is to make sure that debtors have representation for their entire chapter 7 case. The entirely consistent purpose of bifurcation is to provide a way for debtors to afford representation for their entire case. Attorneys and clients do not enter into bifurcated chapter 7 engagements to limit the services that the attorney will provide; rather, they enter into them in order to provide a way for the debtor to have the benefit of a plenary representation. Hence, this Court should resolve any perceived or potential inconsistency in the local rules in favor of approving bifurcation.

      Finally, the option to forego signing a post-petition agreement and instead proceed *pro se* or to hire another attorney parallel the options that a client inherently has in every engagement. Regardless of whether an engagement is bifurcated into separate agreements, and regardless of limited scope representation rules, clients inherently have the right to limit an engagement by terminating the attorney.[3] Recognizing that the client always has this prerogative makes any suggestion that a bifurcated engagement entered into solely to facilitate a thorough, financially feasible representation violates the local rule seem like a stark example of "form over substance." And where an attorney wishes to withdraw from a case (for example if a client exercises their right not to sign a post-petition agreement and instead proceed *pro se*) this Court's

---

[3] It is a useful exercise to ask: if an attorney's fee agreement informed clients that it is their right legally and under the ethical rules to terminate counsel after their bankruptcy petition is filed, and to demand a refund of all or a substantial portion of their traditional, prepaid fee, would this violate the local rule?

11

local rules also require the court's permission, providing a more than adequate protection against an attorney failing to discharge their duty. See Local Rule 2091(A)(1).

### IV.  CONCLUSION

The UST's Motions are a misguided attempt to stop Counsel from offering debtors who otherwise could not afford an attorney the benefit of full representation on financial terms that are feasible. Counsel's fee is reasonable under Section 329, and the structure of the engagements does not offend the local rule.  The Motions should, therefore, be denied.

DATED this 28th day of October, 2020.

| /s/ William H. Ridings | /s/ Daniel E. Garrison |
|---|---|
| William H. Ridings | Daniel E. Garrison, AZ Bar 021495 |
| Ridings Law Firm LLC | Admitted *pro hac vice* |
| 2510 Brentwood Blvd., Ste. 205 | Protego Law, PLLC |
| St. Louis, MO 63144 | 1805 N. Scottsdale Rd., Ste. 100 |
| Tel: (314) 968-1313 | Tempe, AZ 85281 |
| Fax: (314) 968-1302 | Tel: (480) 504-6840 |
| ridingslaw2010@yahoo.com | dan@protegolaw.com |

### Certificate of Service

The undersigned, under penalty of perjury, attests that a copy of the foregoing was served via email upon the following:

Carole J. Ryczek,
Trial Attorney
Office of the United States Trustee
Carole.Ryczek@usdoj.gov


  /s/Daniel E.Garrison