**This order is SIGNED.**

**Dated: April 10, 2019**



KEVIN R. ANDERSON
U.S. Bankruptcy Judge

*ar*

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF UTAH

| In re: | Bankruptcy Number: 16-30360 |
|---|---|
| BRETT JASON HAZLETT<br>Debtor. | Chapter 7 |
| | Hon. Kevin R. Anderson |

**MEMORANDUM DECISION ON MOTION FOR SUMMARY JUDGMENT**
**(DOCKET NO. 126)**

In this case, the Debtor lacked the funds to pay a pre-petition retainer for an attorney to represent him in a Chapter 7 case. Capstone Law offered the Debtor a bifurcated fee arrangement that involved no retainer for filing the petition, and then a post-petition fee agreement to pay $2,000 in ten monthly installments. The parties agreed, Capstone Law filed the case, and the Debtor expeditiously received a discharge. Based on the issues raised by the attorney's use of the bifurcated fee agreements, the U.S. Trustee brought a motion for sanctions, and the attorney filed this motion for summary judgment. Thus, the Court will address the legal and ethical issues that arise when a consumer client needs Chapter 7 relief but, understandably, lacks the cash to pay an up-front retainer.

## I.    JURISDICTION AND VENUE

The Court has jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 1334(a)–(b), 157(b). Weekes' Motion for Summary Judgment is a core proceeding under 28 U.S.C. § 157(b)(2)(H). Venue is appropriate in this District under 28 U.S.C. §§ 1408–1409, and notice of the hearing was properly given to all parties in interest.

## II.    UNDISPUTED FACTS

### A.    The Debtor's Pre-Petition Meetings with Two Bankruptcy Firms

1.    On October 5, 2016, the Debtor was sued on a collection action in a Utah state court. On November 14, 2016, the state court entered a default judgment against the Debtor in the amount of $7,302.[1]

2.    Prior to the entry of the default judgment, the Debtor sought legal assistance to file a Chapter 7 bankruptcy case. The Debtor contacted Lincoln Law Center and was told he would need to first pay a $1,200 retainer before Lincoln Law would file the bankruptcy petition.[2]

3.    The Debtor did not have $1,200 to pay a retainer to Lincoln Law.[3]

4.    The Debtor then contacted Russell B. Weekes ("Weekes") and his law firm Capstone Law, LLC ("Capstone Law" or "Capstone") about filing for bankruptcy.

5.    During the initial consultation on October 27, 2016, Weekes offered the Debtor three options to accomplish the filing of a Chapter 7 bankruptcy case:

---

[1] Motion for Summary Judgment ("Capstone MSJ"), Ex. H, Docket No. 126.

[2] Capstone MSJ, Ex. D, "2004 Examination of Brett Jason Hazlett" at 21–23, Docket No. 126 ("Debtor's 2004 Transcript").

[3] Id. at 24.

i.      The Up-Front Retainer Option: Pay Capstone Law a retainer of $2,400, which included the attorney's fees and court filing fee, to file and represent the Debtor in a Chapter 7 case.

ii.      The $500-Down Option: Enter into a pre-petition agreement and pay a $500 retainer for the preparation and filing of the bankruptcy petition, statement of social security number, and application to pay the court filing fees in installments (collectively the "Initial Bankruptcy Papers"). The Debtor would then have three options: (1) proceed *pro se*; (2) hire another attorney to complete the case; or (3) enter into a post-petition fee agreement with Capstone Law to complete the bankruptcy case.

iii.      The Zero-Down Option: Enter into a pre-petition retainer agreement for the preparation and filing of the Initial Bankruptcy Papers for $0 down, with the option to either proceed *pro se*, hire another attorney, or enter into a post-petition fee agreement of $2,400 (which included fees and costs) for the prosecution of the case through the entry of a discharge. If the Debtor selected the Zero-Down option, he could pay the $2,400 in ten monthly installments of $240.[4]

6.      Weekes then explained to the Debtor the following: (1) the terms of the Prepetition Agreement and its limited scope of services (e.g., Capstone Law would only file the Initial Bankruptcy Papers); (2) the Debtor's options to proceed *pro se*, hire another attorney, or hire Capstone Law; and (3) the terms of the Post-Petition Agreement wherein Capstone Law would

---

[4] Capstone MSJ, Ex. A: "Declaration of Russell B. Weekes," ¶ 13, Docket No. 126 ( "Weekes' Declaration"); and Debtor's 2004 Transcript, 21-24, 37-39.

continue to represent the Debtor after the bankruptcy filing for $2,400 that could be paid in monthly installments.[5]

7.    After these explanations, the Debtor selected the Zero-Down Option because: (1) he did not have the funds to pay a retainer; (2) even though Capstone Law charged a higher fee, the Debtor could pay that fee over ten months after the bankruptcy filing; and (3) the Debtor was experiencing pressure from creditors and feared a garnishment of his wages.[6]

8.    On October 29, 2016, the Debtor personally signed the Pre-Petition Agreement, the Two-Contract Disclosure, and the Third-Party Disclosure and Consent. Weekes also instructed the Debtor in writing on what the Debtor needed to do and the information to be provided before Capstone Law could file the bankruptcy petition.[7]

9.    The above-mentioned documents included a multitude of disclosures, explanations, and warnings regarding the fee arrangement, the bankruptcy process, the possible use of BK Billing as a third party to collect payments, and the importance of providing true, complete, and accurate information to Weekes.

10.    Weekes also provided the Debtor a detailed questionnaire that elicited the information needed by Weekes to prepare the bankruptcy papers. The Debtor completed the questionnaire, signed it in ink, and returned it to Capstone Law.[8]

---

[5] Capstone MSJ, Docket No. 126, Ex. A: Weekes' Declaration, at ¶ 15; Capstone MSJ, Ex. B: "Affordable Bankruptcy Retainer Agreement a/k/a Two Contract Procedure," ¶¶ 1, 3-4 and "Two-Contract Disclosure" (collectively the "Pre-petition Agreement");Capstone MSJ, Ex C: "Completion Retainer Agreement & Promissory Note," ¶ 1 (the "Post-Petition Agreement"); and Debtor's 2004 Transcript, pp. 21-24 and 37-39.

[6] Debtor's 2004 Transcript, pp. 10, 21-24, 37-39.

[7] Capstone MSJ, Ex B and Debtor's 2004 Transcript, pp. 22-24.

[8] Ex. B: "Client Questionnaire," Docket No. 36.

11.     Weekes also provided the Debtor with a document titled "General Information and Instructions" (the "Instructions"). The Instructions contain almost fifty paragraphs of disclosures and explanations that the Debtor was required to read and initial. Except for the paragraph on student loans, the Debtor initialed all of the disclosures and explanations and signed the document in ink.[9]

12.     As to bankruptcy papers requiring the Debtor's signature, Weekes utilized Adobe Sign[10] to send the Debtor documents for review and to obtain an e-signature on such documents. The Debtor signed all the Initial Bankruptcy Papers using Adobe Sign. Weekes maintained appropriate log entries of the documents emailed to the Debtor, the documents reviewed by the Debtor, and when the Debtor signed the documents using Adobe Sign.[11]

**B.     The Chapter 7 Bankruptcy Filing**

13.     On November 22, 2016, Weekes filed the Chapter 7 petition for the Debtor along with the Initial Bankruptcy Papers.

14.     The filed bankruptcy papers included an application for the Debtor to pay the filing fee in installments with $200 due on December 6, 2016, and a final installment of $135 due on January 2, 2017.[12] Capstone Law timely made the filing fee installments on behalf of the Debtor, with this amount being part of the Post-Petition Fee Agreement.

15.     After filing the petition, the Debtor electronically signed the Post-Petition Agreement, the Check Draft Authorization, and the Third-Party Disclosure and Consent.[13] These

---

[9] *Id.*

[10] Adobe Sign is an established e-signature program that complies with the requirements of the ESIGN Act (15 U.S.C. ch. 96), which is intended to give electronic signatures the same legal effect as a holographic signature.

[11] Capstone MSJ, Ex. G: "Adobe Sign Document History," Docket No. 126.

[12] Order to Pay Filing Fee in Installments, Docket No. 6.

[13] Weekes' Declaration ¶ 16; The Post-Petition Agreement, Docket No. 126.

documents likewise contain detailed disclosures and explanations as to the attorney fee arrangement, the legal services to be provided, and the Debtor's responsibilities.

      a.   Specifically, the Post-Petition Agreement states that the total cost would be $2,400, and that the Debtor would pay this amount in ten monthly installments of $240.

      b.   The Debtor e-signed the Check Draft Authorization that provided for the automatic withdrawal of the monthly installments, but its payment schedule is different from the Post-Petition Agreement in that it provides for ten monthly payments of only $200, for a total of $2,000. The Check Draft Authorization also provided that the payments would be drawn from the account of Savannah Smith, the Debtor's non-filing spouse.[14]

      c.   The Debtor also e-signed the Third-Party Disclosure and Consent, which explained Weekes' factoring relationship with BK Billing, who would act as the collection agent on the law firm's behalf.

### C.      The BK Billing Factoring Service

22.      Because the Debtor agreed that Weekes would represent him post-petition, Weekes prepared and filed all the other required bankruptcy papers, which were also signed electronically by the Debtor.

23.      The Form 2030, Disclosure of Compensation of Attorney for Debtor ("Disclosure of Compensation"), which is required by Bankruptcy Rule 2016, states that Weekes agreed to accept $2,007 for his legal services (exclusive of costs), and that he had not received a retainer.[15]

---

[14] The Debtor's Motion for Sanctions asserts that the non-filing spouse closed her account when she lost her job, that the Debtor provided his mother's credit card information to make one payment to BK Billing, and that BK Billing wrongfully continued to bill the mother's credit card (see Debtor's 2004 Transcript at 119–23, Docket No. 126). However, BK Billing is not a party before the Court; thus, for purposes of this motion, the Court will not consider these allegations or issues arising therefrom.

[15] Disclosure of Compensation of Attorney for Debtor, Docket No. 9.

24.     Under the Post-Petition Agreement and the Check Draft Authorization, the Debtor has paid a total of $1,800 towards the $2,007 attorney fee.[16]

25.     Weekes represented the Debtor at a meeting of creditors, provided documents to the Chapter 7 Trustee in accordance with 11 U.S.C. § 521,[17] and otherwise assisted the Debtor in all tasks necessary for the Debtor to qualify for and receive a discharge on March 15, 2017.[18] No party has requested a revocation of the Debtor's discharge under § 727(d), and the one-year limitation period for bringing such an action expired on March 15, 2018 (see § 727(e)).

26.     On April 12, 2017, the Chapter 7 Trustee filed a no-asset report, and the case was closed on May 15, 2017.

27.     The Court has reviewed the docket and observes that in all respects the case was uneventful in that no motions or adversary proceedings were filed, and the Debtor received a full discharge within 113 days after the bankruptcy filing.

### D.      Reopening the Bankruptcy Case

28.     On September 25, 2017, the U.S. Trustee filed a motion to reopen the case to review the Capstone Law retainer agreements and Capstone's use of BK Billing to factor the post-petition fee. On October 23, 2017, the Court granted the motion, and the U.S. Trustee took the Debtor's examination under Bankruptcy Rule 2004.

29.     On March 9, 2018, after completing its investigation, the U.S. Trustee filed its motion for sanctions against Weekes and Capstone Law based on the following: (1) the marketing

---

[16] Capstone MSJ, Ex. E: BK Billing Customer Account for Brett Hazlett, Docket No. 126.

[17] Unless otherwise specified, all subsequent chapter and section references herein are to Title 11 of the United States Code.

[18] *See* Statement of Financial Affairs and Schedules, Docket No. 7; Chapter 7 Statement of Your Current Monthly Income, Docket No. 8; Disclosure of Compensation of Attorney for Debtor, Docket No. 9; 341 Meeting Notice, Docket No. 10; Personal Financial Management Course Certificate, Docket No. 11.

of Zero-Down Chapter 7 bankruptcy services; (2) the bifurcation of bankruptcy services into pre-
petition and post-petition fee agreements; (3) filing the petition and the Initial Bankruptcy Papers
for purportedly no charge; (4) the reasonableness of the $2,400 post-petition fee; (5) the use of BK
Billing to factor and collect the fee; and (6) the propriety of utilizing electronic signatures in
bankruptcy.

### E.   The U.S. Trustee's Motion and Weekes' Opposition

30.     On March 9, 2018, the U.S. Trustee filed its motion seeking the following relief:
(1) cancellation of the attorney fee agreements between Weekes under § 329 and Local Rule 2091-
1; (2) sanctions under Local Rules 2090-3, 2091-1(a), and 5005-2(c); and (3) sanctions and other
relief under § 526.[19]

31.     In its motion, the U.S. Trustee asserted that Weekes' use of the BK Billing Model
had an adverse impact on the Debtor, created a prohibited conflict of interest, and diminished the
integrity of the bankruptcy system. As remedy, the U.S. Trustee asked the Court for an order
cancelling the fee agreements between Weekes and the Debtor, disgorging all fees paid by the
Debtor, and imposing monetary sanctions.

32.     Weekes filed an opposition to the Motion,[20] and later he filed this Motion for
Summary Judgment.[21]

33.     Weekes asserts that he made full disclosures to the Debtor so that the Debtor could
make an informed decision about the bifurcated fee agreements. Weekes asserts that the use of the
bifurcated fee agreements allowed the Debtor to retain and pay for legal counsel, who facilitated

---

[19] U. S. Trustee's Motion, Docket No. 61.

[20] Objection to Motion for Contempt/Sanctions, Docket No. 66.

[21] Capstone MSJ, Docket No. 126.

the Debtor receiving a discharge without complications. Finally, Weekes asserts that his fee of $2,000 was reasonable under § 329, and that his use of electronic signatures does not merit the imposition of sanctions.

34.    At the hearing on Weekes' Motion for Summary Judgment held on January 4, 2019, the parties discussed the need to comply with the Bankruptcy Code and the ethical rules while enabling cash-poor debtors to retain and pay for legal counsel to represent them during a Chapter 7 case.

35.    At the hearing, the U.S. Trustee expressed more interest in obtaining guidance from the Court regarding the use of bifurcated fee agreements in consumer Chapter 7 cases than in sanctioning Weekes in this specific case.

## III.    ANALYSIS

### A.  When Consumer Debtors Lack the Funds to Pay a Pre-Petition Retainer for Legal Services.

This case evidences the challenges to debtors, debtors' counsel, and the Chapter 7 system when individuals in need of bankruptcy relief do not have the ability to pay a pre-petition retainer to hire an attorney. Whether intentional or not, there are statutory and ethical challenges, unique to consumer Chapter 7 cases, that arise when debtors can only afford to pay for legal services with payments made *after* their bankruptcy filing.[22]

As a result, debtors who cannot pay an up-front retainer are left with three ineffectual options. First, the debtor can proceed as a true *pro se* party by preparing, filing, and prosecuting a

---

[22] In *Lamie v. United States Trustee*, 540 U.S. 526 (2004), the Supreme Court held that a Chapter 7 debtor's counsel cannot be paid from property of the bankruptcy estate and that the balance of any fee owing at the time of the bankruptcy filing is dischargeable. In other words, debtor's counsel must be paid in full before filing the bankruptcy petition. This predicament precipitated the concept of bifurcated fee agreements in consumer cases. Under this approach, the debtor enters into a pre-petition agreement with the attorney to file the petition, and then a subsequent agreement that provides for the payment of the attorney's post-petition fees for post-petition services.

bankruptcy case entirely on their own. Second, and more problematic, is that a debtor can turn to a bankruptcy petition preparer. There may be competent petition preparers who charge a reasonable fee and appropriately limit their services to typing bankruptcy papers. However, the Court's experience strongly suggests that debtors are not only being overcharged by petition preparers,[23] but they are receiving inaccurate and often prejudicial advice on how to prosecute their cases.[24]

Under either of these *pro se* options, the Chapter 7 consumer system becomes unnecessarily time-consuming and ineffective for debtors, creditors, trustees, and the Court. Not surprisingly, the Court's statistics evidence that 30% of *pro se* Chapter 7 debtors fail to receive a discharge.[25] Most concerning is that because *pro se* debtors do not fully understand the complex requirements of even a straight-forward Chapter 7 case, they are much less able to resolve even simple errors in their bankruptcy papers, to adequately respond to the requests of the Chapter 7 Trustee, or to comply with court orders. As a result of such failures, *pro se* debtors can have their discharge denied under § 727, meaning instead of receiving a fresh start, they are shackled with a lifetime of nondischargeable debt. This is troubling when it appears that with even minimal legal assistance, debtors might avoid or resolve these problems and obtain a discharge.

The Court is not alone in its concern as to how the present system makes it difficult for individuals in need of Chapter 7 relief to afford an attorney. As noted by one bankruptcy judge:

---

[23] Based on a sampling of the Form B2030 ("Disclosure Of Compensation Of Bankruptcy Petition Preparer") filed in the District of Utah, the average fee charged by petition preparers is around $400.

[24] *See In re Monson*, 522 B.R. 340 (Bankr. D. Utah 2014) (discussing petition preparer problems in two Chapter 7 consumer cases).

[25] *Pro se* Chapter 7 discharge statistics for the District of Utah for 2010 through 2015.

Paying for an attorney is simply not possible for many who need the benefits of the Bankruptcy Code. Not having $1,000 or more for an up-front fee causes many to choose the wrong chapter or seek out fraudulent services. Without adequate access for all to our nation's bankruptcy laws, our courts are, very simply, failing to meet the Constitution's promise of equal justice for all. It is an odd situation when the nation's debt-relief laws are only meaningful to the well-heeled, but cash-strapped, debtor or large corporations.[26]

Further, if debtors cannot afford an up-front Chapter 7 retainer, they may opt to file under Chapter 13, where attorneys can appropriately offer a "zero-down" option because their fees can be paid post-petition through the plan.[27] While Congress amended the Bankruptcy Code in 2005[28] to encourage consumers to file under Chapter 13, this policy must be balanced against an attorney's ethical duty to place debtors in the bankruptcy Chapter that is most appropriate for their circumstances.[29] For example, Chapter 13 requires a debtor to make a minimum of thirty-six monthly plan payments to the trustee. Unless the debtor can timely and consistently make these plan payments, the case will be dismissed without a discharge.[30] Further, if debtors have minimal, non-exempt assets and are not seeking to retain and pay for secured collateral, it is often not in

---

[26] Hon. Maureen A. Tighe, *Seeking Innovation to Address Low-Income Access to Bankruptcy*, XXXVII ABI Journal 11, 38 (2018). *See also* Hon. Henry R. Callaway & Jonathan Petts, *Too Broke for a Fresh Start*, XXXVIII Am. Bankr. Inst. J. 2 (2019); Pamela Foohey *et al.*, *Life in the Sweatbox*, 94 Notre Dame L. Rev. 220 (2018). *See also Gordon v. Hines (In re Hines)*, 147 F.3d 1185, 1191 (9th Cir. 1998) ("[T]he very administration of the bankruptcy system requires that attorneys for Chapter 7 debtors must have a [right to be paid]. If the absence of such a right were to become law, it does not require much thought to recognize that the entire system would suffer a massive breakdown.").

[27] *See In re Wark*, 542 B.R. 522 (Bankr. D. Kan. 2015) (A 100-page decision involving ten different debtors that discusses the legal and ethical issues of filing under Chapter 13 rather than Chapter 7 so the debtor can afford to pay for legal counsel).

[28] Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (Pub.L. 109–8, 119 Stat. 23, enacted April 20, 2005). *See also* H. Rept. 109-31 - BANKRUPTCY ABUSE PREVENTION AND CONSUMER PROTECTION ACT OF 2005, 109th Congress (2005-2006) (expressing the need for individuals in bankruptcy to pay back some of their debts if they have the means to do so).

[29] *In re Wark*, 542 B.R. at 529 (discussing the many substantive differences to debtors in filing under Chapter 13 versus Chapter 7); *see also* Pamela Foohey *et al.*, *Attorneys' Fees and Chapter Choice: Exploring "No Money Down" Chapter 13 Bankruptcy*, XXXVI Am. Bankr. Inst. J. 6 (2017) (discussing how debtors who cannot afford to pay a retainer for a Chapter 7 case are often left with no choice but to file under Chapter 13 – even if Chapter 13 is not in their best interest).

[30] § 1328(a).

their best interest to be put into a three-year plan just to pay attorney's fees. In all instances, a debtor's inability to pay an up-front retainer should not be the deciding factor in choosing between filing under Chapter 7 or Chapter 13.[31]

In an effort to work around the conundrum of providing consumer debtors with competent legal representation while offering an affordable payment system, debtors' counsel have employed a number of processes with unsatisfactory results. These include debtors issuing post-dated checks,[32] paying legal fees with a credit card,[33] withdrawing funds from a retirement plan, or taking out a home equity loan. Each of these options can be problematic for the attorney and ill-advised for the debtor.

This outcome is ironic given that the Bankruptcy Code and Rules governing attorney's fees, coupled with the applicable ethical canons, are intended to protect debtors. Yet, these high-minded requirements and restrictions often result in greater prejudice to debtors who do not receive a discharge (or worse are denied a discharge under § 727) simply because they are too poor to pay a retainer up front to procure the needed legal representation.

Lastly, these impediments are sometimes enforced against counsel based on an assumption that debtors are unable to make rational decisions about how best to manage their financial affairs and legal options. With appropriate disclosures, debtors can make informed decisions as to the risks and benefits of incurring a post-petition obligation in order to retain an attorney's services.

---

[31] Pamela Foohey et al., *Attorneys' Fees and Chapter Choice*, at p. 63 ("The ultimate goal . . . is not to abolish "no money down" chapter 13s, but to allow all debtors to weigh the benefits and costs of filing chapter 7 or 13 without having to consider how they will pay the attorney's fees.").

[32] *In re Waldo*, 417 B.R. 854 (Bankr. E.D. Tenn. 2009) (requiring an attorney to disgorge fees paid by post-dated checks). *But see In re Hines*, 147 F.3d 1185 (9th Cir. 1998) (holding that it was not a violation of stay for attorney to cash post-dated checks in payment of fees); *Bruce v. Sandberg (In re Sandberg)*, No. 13-05050, slip op. (Bankr. N.D. Ga. Feb 5, 2015) (holding that attorney's use of post-dated checks in payment of Chapter 7 fees was not fraudulent).

[33] *Cadwell v. Kaufman (In re Cadwell)*, 886 F.3d 1153 (11th Cir. 2018) (holding that attorney who instructed debtor to pay retainer by credit card could be liable for a cause of action under § 526(a)(4)).

Certainly, debtor's counsel must assiduously avoid misleading a consumer debtor into filing an unnecessary bankruptcy case or taking financial advantage of debtors when they are most vulnerable. But providing a means for debtors to pay a reasonable attorney's fee through post-petition payments so debtors can afford the necessary legal services to obtain a Chapter 7 discharge should not, standing alone, implicate negative ethical issues.

### B.  Background on Bifurcated Fee Agreements in Consumer Chapter 7 Cases.

At the time when the Debtor filed his Chapter 7 petition, there was no clear guidance in this District about the propriety of bifurcated retainer agreements in consumer Chapter 7 cases. However, cases from other jurisdictions at this time, including the Ninth and Seventh Circuit Courts of Appeals, supported, or at least acquiesced to, this approach to enable cash-challenged debtors to retain and pay for legal counsel to assist them in achieving a Chapter 7 discharge.[34]

Based on these cases, the Court finds that Weekes had a reasonable, legal basis to employ bifurcated fee agreements when clients were unable to pay a full retainer prior to their bankruptcy filing. Further, without a specific ruling from this Court on bifurcated fee agreements, it was reasonable for Weekes to continue to use them. Moreover, as explained more fully below, the

---

[34] *In re Hines*, 147 F.3d at 1185 (noting that the Chapter 7 system would break down if lawyers could not accept post-petition payments for their fees); *Bethea v. Robert J. Adams & Assocs.*, 352 F.3d 1125, 1128 (7th Cir. 2003) ("Those [debtors] who cannot prepay in full can tender a smaller retainer for prepetition work and later hire and pay counsel once the proceeding begins—for a lawyer's aid is helpful in prosecuting the case as well as in filing it."); *Walton v. Clark & Washington, P.C.*, 469 B.R. 383 (Bankr. M.D. Fla. 2012) (endorsing specific bifurcation of services model and providing guidance on how to do it); *In re Slabbinck*, 482 B.R. 576, 584 (Bankr. E.D. Mich. 2012) (same); *In re Waldo*, 417 B.R. at 895–96 (Bank. E.D. Tenn. 2009) (rejecting counsel's use of post-dated checks but endorsing bifurcated services with appropriate processes); *In re Lawson*, 437 B.R. 609 (Bankr. E.D. Tenn. 2010) (same); *In re Griffin*, 313 B.R. 757, 769–70 (Bankr. N.D. Ill. 2004) (in *dicta*, endorsing the bifurcation model and providing some guidance on its use); *In re Abdel-Hak*, No. 12-46329-MBM, 2012 Bankr. LEXIS 5393, 2012 WL 5874317, at *7 (Bankr. E.D. Mich. Nov. 16, 2012) (same); *Casamatta v. Castle Law Office of Kan. City, P.C. (In re James)*, No. 17-41965-BTF7, 2018 Bankr. LEXIS 3965, at *3, 2018 WL 6728395, at *2 (Bankr. W.D. Mo. Nov. 28, 2018) (acknowledging allowance of bifurcated fee agreements if "the fee arrangement is fully disclosed to the court, and the fees charged for both the pre- and postpetition services are reasonable.").

Court finds that this process did not harm the Debtor. Indeed, it facilitated the Debtor's ability to afford legal counsel to expeditiously receive a discharge.

**C.    Are Bifurcated Fee Agreements Prohibited by the Bankruptcy Code and/or the Utah Rules of Professional Conduct?**

    1.   Bifurcated Fee Agreements Versus Unbundling.

        The Court wishes to distinguish between the use of bifurcated fee agreements and a limited services agreement or unbundling. With unbundling, the attorney is contractually limiting services to a discrete task, such as filing the bankruptcy petition. With bifurcated fee agreements, the attorney is contracting to represent the debtor during the entire case, contingent on the debtor signing the post-petition agreement. The primary concern with unbundling is that the attorney provides a limited service and then leaves the client to his or her own devices to complete the legal process. This is problematic, even though it is becoming more widely recognized that having at least some legal representation in a consumer Chapter 7 case is better than none.[35]

        However, in this case, the purpose of the bifurcated fee agreements is decidedly not to abandon the debtor,[36] but to enable the attorney to be paid for the post-petition services. It is true that under the process followed by Capstone Law, debtors were given the option to proceed *pro se.* But that decision is solely up to the debtor, as the attorney is ready and willing to complete the representation upon the signing of the post-petition fee agreement. Thus, the bifurcated fee

---

[35] AM. BANKR. INST., FINAL REPORT OF THE ABI NATIONAL ETHICS TASK FORCE (2013), pp. 53-54

    Although both sides of the argument [on unbundling] have merit, the Task Force is viewing the [Limited Services] Proposal as a needed alternative to a debtor's pro se representation.

    . . .

    Despite well-founded concerns for protecting the interests of consumer debtors, the trend in bankruptcy cases (and non-bankruptcy cases) generally favors allowing limited representation in some form. The target of this proposed rule is the debtor who falls in the liminal space between not qualifying for legal aid but with limited funds to pay for full-service representation.

[36] It is clearly the attorney's intent and hope that the debtor will sign the post-petition agreement.

agreement is not for unbundling but to facilitate the debtor's post-petition payment for the attorney's post-petition services. And the fact that the post-petition payments can be made in installments only increases the affordability of the attorney's services and thereby increases a debtor's access to legal representation.

### 2.  Considerations Under the Utah Rules of Professional Conduct.

Some months after the Debtor's bankruptcy filing, the Utah State Bar issued an ethics opinion on the use of "zero-down" bankruptcy filings, bifurcated fee agreements, and the factoring of attorney's fees (the "Utah Ethics Opinion").[37] The Utah Ethics Opinion contains a cogent discussion of a consumer's need for legal representation in filing for bankruptcy balanced against a lawyer's statutory and ethical responsibilities to the client. The analysis and opinions in the Utah Ethics Opinion informs the Court's decision on these issues.

On the issue of unbundling, the Utah Ethics Opinion holds that a "lawyer is allowed to limit the scope of her engagement if the limitation is reasonable under the circumstances and the client gives informed consent."[38] It then provides a number of factors and standards that must be considered when debtor's counsel seeks to limit representation. However, the Utah Ethics Opinion then notes that its guidance is contingent on the Utah Bankruptcy Court allowing unbundling in Chapter 7 cases.

As noted above, this case does not specifically involve unbundling, and the Court is not willing at this point to alter its view on this issue. As discussed in more detail below, debtor's

---

[37] Opinion No. 17-06, Utah Ethics Opinion, Utah State Bar Ethics Advisory Opinion Committee, issued September 27, 2017, revised August 16, 2018 ("Utah Ethics Opinion") (available at http://www.utahbar.org/wp-content/uploads/2018/09/17-06-Revised-002.pdf).

[38] *Id*. at ¶ 11.

counsel must still comply with Local Rule 2091-1 and be committed to providing the appropriate scope of services if the debtor is willing to sign the post-petition fee agreement.

The Utah Ethics Opinion then addresses the ethical constraints of requesting a debtor client to sign a post-petition fee agreement:

> Care must be taken to include only fees generated post-petition in the post-petition attorney fee contract. Care must also be given to full disclosure of the necessity for further work and the amount to be charged. As individuals in consumer bankruptcy are perhaps hiring a lawyer for the first time in their lives, the lawyer has a duty of fully informing the client in advance about these matters.

The Court agrees with this statement. The propriety of using bifurcated fee agreements in consumer Chapter 7 cases is directly proportional to the level of disclosure and information the attorney provides to the client, and the existence of documentary evidence that the client made an informed and voluntary election to enter into a post-petition fee agreement.[39] In reviewing the written disclosures and information provided by Capstone Law, and signed in ink by the Debtor, the Court finds that they satisfy the requirements of full disclosure and informed consent.

Further, the Court is likewise adamant that fees for pre-petition services should not be directly or surreptitiously slipped into the fee charged for post-petition services. If this happens, it could be cause for disgorgement under § 329 or other sanctions. As noted below, the Court finds that Capstone's fees in this case were for post-petition services, and that they were reasonable. Nonetheless, the Utah Ethics Opinion states that it is not expressing an opinion as to Utah bankruptcy law on bifurcated fee agreements.[40] The Court will now address this question.

---

[39] See Utah R. Prof. Cond. 1.1(f): "'Informed Consent' denotes the agreement by a person to a proposed course of action after the lawyer has communicated adequate information and explanation of the material risks of and reasonably available alternatives to the proposed course of action"

[40] Utah Ethics Opinion, n. 8.

Case 16-30383   Doc 151   Filed 04/04/19   Entered 04/24/20 09:16:00   Desc Main
Document   Page 17 of 27

### 3.  Bifurcated Fee Agreements Under the Bankruptcy Code and Rules.

Section 329 mandates disclosures for payments made "in a case under this title, or in connection with such a case," and requires that all fees paid for bankruptcy-related services be reasonable.[41] This section is augmented by Bankruptcy Rule 2016(b), which requires that counsel disclose to the Court all compensation paid or agreed to be paid. Such disclosures under the Code are mandatory, not permissive,[42] as they allow the court to review the "nature and amount of compensation paid or promised by the debtor for legal services in contemplation of bankruptcy."[43]

Thus, all aspects of any compensation agreement between debtor's counsel and the client should be explained in the Form B2030 Disclosure of Compensation filed with the court. Violations of this rule can result in sanctions, including the disgorgement of compensation.[44] The purpose of these disclosures is to ensure that debtors are not taken advantage of when perhaps most vulnerable, that the fees are reasonable, and that debtors are not treated unfairly.[45]

Therefore, based on its review of the Utah Ethics Opinion, the Bankruptcy Code, and applicable law, the Court finds that the use of bifurcated fee agreements in consumer Chapter 7 cases to effectuate affordable legal services are not *per se* prohibited by the Bankruptcy Code and applicable law, they do not *per se* implicate ethical issues, and they are not *per se* unfair.[46]

---

[41] § 329.

[42] *See Turner v. Davis, Gillenwater & Lynch (In re Inv. Bankers, Inc.)*, 4 F.3d 1556, 1565 (10th Cir. 1993) (*citing In re Bennett*, 133 B.R. 374, 378 (Bankr. N.D. Tex. 1991)).

[43] *In re Perrine*, 369 B.R. 571, 580 (Bankr. C.D. Cal. 2007).

[44] *In re Inv. Bankers*, 4 F.3d at 1565; *In re Smitty's Truck Stop, Inc.*, 210 B.R. 844, 848–49 (10th Cir. BAP 1997).

[45] The Consumer Financial Protection Act defines "unfair" as "(1) an act or practice that causes or is likely to cause substantial injury to a consumer; (2) which is not reasonably avoidable by the consumer; and (3) such substantial injury is not outweighed by countervailing benefits to the consumer." 12 U.S.C. § 5531.

[46] *See In re Slabbinck*, 482 B.R. 576, 597 (Bankr. E.D. Mich. 2012) (finding no *per se* prohibition against unbundling "if the attorney's legal services for an individual debtor are unbundled between pre-petition services and post-petition

4. <u>Essential Practices When Using Bifurcated Fee Agreements</u>.

However, the use of bifurcated fee agreements and the related payment options in consumer Chapter 7 cases must be governed by the following prime directives. First, other than deciding whether to represent a debtor, all dealings and decisions, including the offered methods of payment, must be based on the client's best interests and not the lawyer's financial interests.[47]

Second, all fees for legal services, including any finance charge on installment payments, must be reasonable and necessary.[48] This does not mean the attorney must charge the same to a client who can pay an up-front retainer versus a client who must use a bifurcated fee agreement, but that pricing differential must be based on reasonable and quantifiable factors, and it must not include the cost of pre-petition services. Also, if the price differential is challenged by any party, including the Court, counsel should be prepared to justify it.

Third, all fee arrangements must be fully revealed in the Form B2030 Disclosure of Compensation, which must be filed within fourteen days of the petition.[49] The disclosures must include the details of the pre-petition and post-petition fee agreements, any payment plan, and any interest charge on installment payments. The Disclosure of Compensation should be immediately amended to reflect any changes to these terms.

Fourth, if the client elects to proceed *pro se* or to retain the services of another lawyer, the filing attorney must immediately comply with Local Rule 2091-2 regarding the substitution or withdrawal of counsel.

---

services [and] . . . such unbundling of legal services does not by itself warrant any relief under § 329 of the Bankruptcy Code.").

[47]Advising a client based on the lawyer's financial interests creates a conflict of interest that is a violation of Rule 1.7(a)(2) of the Utah Rules of Professional Conduct.

[48] *See* § 329(b) and Rule 1.5 of the Utah Rules of Professional Conduct.

[49] Fed. R. Bankr. P. 2016(b).

In summary, the Court is neither encouraging nor prohibiting the use of bifurcated fee agreements in consumer Chapter 7 cases. But debtor's counsel may employ this option in situations where: (1) it is in the best interests of the client (e.g., the client could not otherwise afford to hire bankruptcy counsel); (2) the attorney provides appropriate disclosures, options, and explanations; (3) the client gives informed consent in writing; and (4) the attorney's fee and costs are reasonable and necessary. Of course, all fee arrangements with debtors are subject to review under § 329 by motion of a debtor or the U.S. Trustee, or *sua sponte* by the Court.

### 5. An Attorney's Scope of Representation Under Local Rule 2091-1.

The U.S. Trustee next raised the question whether the use of bifurcated fee agreements violated Local Rule 2091-1, which establishes minimum requirements relating to an attorney's scope of representation:

> **Scope of Representation**. A debtor's attorney must represent and advise the debtor in all aspects of the case, including the § 341 Meeting, motions filed against the debtor, reaffirmation agreements, agreed orders, and other stipulations with creditors or third parties, and post-confirmation matters. The debtor's attorney must also represent the debtor in adversary proceedings filed against the debtor unless, pursuant to this rule, the Court has excused the attorney from this requirement. The scope of representation cannot be modified by agreement. The court may deny fees or otherwise discipline an attorney for violation of this rule.[50]

The issue is that the Rule does not allow the scope of representation to be modified by agreement, yet Capstone's agreements gave the Debtor the option to proceed *pro se* or to retain new counsel. The intent of this rule is indeed to restrict the use of limited service agreements (unbundling) by debtor's counsel. However, as noted above, the difference with Capstone's bifurcated agreement procedure is that the law firm is willing to complete the representation, and it is only by the debtor's election that the case proceeds *pro se*. Debtors are free at any time to

---

[50] Bankr. D. Ut. LBR 2091-1(a) (*emphasis added*).

terminate a lawyer's services, so the Court does not see the use of bifurcated fee agreements as creating the problem addressed by Local Rule 2091-1. Thus, the Court finds that it is not a *per se* violation of this Rule if an attorney uses bifurcated fee agreements in a consumer Chapter 7 case to facilitate the debtor's ability to afford legal representation.

### D.  Was the Fee Charged by Capstone Law Reasonable Considering the Facts and Circumstances of the Case?

The U.S. Trustee has also asserted that Capstone Law should be required to refund the attorney's fees to the Debtor under § 329. This section provides that if a fee agreement "exceeds the reasonable value of any such services, the court may cancel any such agreement, or order the return of any such payment."[51] However, Section 329 is not a "vehicle for sanctioning a debtor's attorney."[52] The express terms and purpose of Section 329 are "limited; it regulates 'the relationship between a debtor and the debtor's attorney."[53] "Its purpose is not to protect the bankruptcy system as a whole . . . ."[54] "The sole question under § 329, then, is whether 'the fee charged by the attorney is excessive i.e., that it exceeds the reasonable value of the services provided . . . .'"[55]

The Tenth Circuit has held that the factors set forth in § 330(a)(3) must be considered in determining whether an attorney's fees are reasonable.[56] These factors include: (1) the time spent on such services; (2) the rate for such services; (3) whether the services were necessary to the

---

[51] 11 U.S.C. § 329(b)

[52] *In re Petrovic*, 560 B.R. 312, 317 (Bankr. N.D. Ill. 2016).

[53] *Id.* at 316.

[54] *Id.*

[55] Id. (citing *In re Geraci*, 138 F.3d 314, 318 (7th Cir. 1998)).

[56] *Houlihan Lokey Howard & Zukin Capital v. Unsecured Creditors' Liquidating Tr. (In re Commer. Fin. Servs.),* 427 F.3d 804 (10th Cir. 2005).

administration of a case; (4) whether the services were performed within a reasonable amount of
time; (5) whether the professional has demonstrated skill and experience in the bankruptcy field;
and (6) whether the compensation is reasonable for a comparably-skilled practitioner outside the
bankruptcy context.[57]

     The U.S. Trustee's motion asserts the following:

> The $2,400 flat fee for performing all of the legal representation in a case such as
> this is manifestly excessive and unreasonable, particularly if one considers that,
> under the Fee Agreements, the only services purportedly addressed by the fees are
> the post-petition services of Schedules and Statements preparation, meeting of
> creditors' attendance and the provision of documents to the trustee.

     However, after reviewing the facts of this case, the Court finds that the Debtor received
reasonable value for the fee paid. First, the $2,400 fee included the post-petition payment of the
$350 filing fee along with other costs, with the balance of $2,007 constituting the attorney's fee.
Second, Capstone Law provided billing records showing that the post-petition services, excluding
time spent dealing with the Debtor's installment payments, had a lodestar value of $2,240. Third,
Capstone Law adequately represented the Debtor in the case in that there were no complications,
the Debtor was not required to turnover assets or provide additional information to the Chapter 7
trustee, the Debtor expeditiously received a discharge 118 days after the petition date, and the
Debtor's discharge is now final under § 727(e). This is an appropriate result for the fee paid. For
these reasons, the Court finds that there is no basis to "order the return of any such payment" to
the Debtor under § 329.

    **E.**    **Capstone's Use of BK Billing to Factor the Fees.**

     The U.S. Trustee also raised concerns about the use of BK Billing to "factor" the Debtor's
legal fee. In this case, Weekes assigned to BK Billing the right to collect the total of $2,400 in fees

---

[57] 11 U.S.C. § 330(a)(3).

and costs in exchange for the immediate receipt of $1,800 from BK Billing—essentially a 25% discount. Weekes disclosed this arrangement to the Debtor in the Third-Party Disclosure and Consent that was signed by the Debtor; however, the arrangement was not revealed in Capstone's Disclosure of Compensation.

When this case was filed in November 2016, there were no reported decisions regarding the use of BK Billing by a debtor's counsel. Since then, decisions from other jurisdictions have raised significant objections to an attorney's use of BK Billing to collect fees.[58] The *In re Wright* decision articulates four concerns regarding factoring in general and the use of BK Billing specifically. These objections track with the issues raised in the U.S. Trustee's motion for sanctions:

1.  The attorney's failure to list in the Disclosure of Compensation all aspects of the fee splitting arrangement with BK Billing;

2.  Clients who used the "zero-money-down" option with fees factored by BK Billing ended up paying 25% more than those who paid the retainer up front;

3.  The improper shifting of most, if not all, of the fees to the post-petition fee agreement;

4.  A conflict of interest in both creating a non-dischargeable debt through the use of a post-petition fee agreement and a conflict arising from the attorney's desire to maintain a favorable relationship with BK Billing while representing the client.[59]

In addition, the subsequent Utah Ethics Opinion addressed the issue of factoring attorney's fees in bankruptcy cases with the following comments:

---

[58] *In re Wright*, 591 B.R. 68 (Bankr. N.D. Okla. 2018); *In re Grimmett*, No. 16-01094-JDP, 2017 Bankr. LEXIS 1492, 2017 WL 2437231 (Bankr. D. Idaho June 5, 2017).

[59] *In re Wright*, 591 B.R. 68, 89-99 (Bankr. N.D. Okla. 2018).

While it is not a violation of the Utah Rules of Professional Conduct to sell a lawyer's accounts receivable, the client must be fully informed with respect to the transaction. The client must be offered the same discounted price. The client must consent in writing to the sale and must be informed that the legal fees for post-petition work are not dischargeable. The lawyer must inform the client that the legal financing company will collect the fee and if there were to be a dispute between the finance company and the client, the lawyer would not represent the client.

The fee charged the client (including the finance company discount) must be reasonable. Reasonable fees in consumer bankruptcy are governed by Rule 1.5(a) of the Utah Rules of Professional Conduct.

The Court agrees with this guidance regarding the factoring of attorney's fees. But given the potential concerns raised in other cases, including those described in *Wright*, the Court would discourage the use of the BK Billing arrangement, or a similar factoring mechanism, unless it strictly complies with the guidance in the Utah Ethics Opinion. And even then, such must be fully disclosed, and the Court may review these arrangements for compliance with § 329 and any applicable rules.

Nonetheless, the Court has reviewed the Third-Party Disclosure and Consent signed by the Debtor. Even though it predates the Utah Ethics Opinion, the Court finds it to generally comply with the principles stated therein (with the possible omission of a statement that Capstone would not represent the Debtor in any dispute with BK Billing).[60] Therefore, Capstone's use of the Third-Party Disclosure and Consent, coupled with the assignment of the receivable to BK Billing, does not, in this instance, justify the imposition of sanctions.

---

[60] This conclusion is somewhat bolstered by evidence that, prior to engaging in a bifurcated fee arrangement with the Debtor, Weekes sought, and appeared to obtain, the U.S. Trustee's approval of Capstone Law's Third-party Disclosure forms. *See* Capstone MSJ, Docket No. 126-2, Ex. A: Weekes' Declaration, at p. 16.

### F.    The Use of Electronic Signatures to Sign Bankruptcy Papers.

In their Motion for Sanctions, the U.S. Trustee requested additional sanctions against Weekes because he had the Debtor electronically sign some of the bankruptcy papers. The Court finds that Weekes' use of electronic signatures in this case does not justify a sanction.

Regarding electronic signatures, Bankruptcy Rule 5005(a)(2) states that "a court may by local rule permit or require documents to be filed, signed, or verified by electronic means that are consistent with technical standards, if any, that the Judicial Conference of the United States establishes."[61] The Local Rule in effect at the time of this bankruptcy filing provided:

> **Retention Requirements**.  Documents that are electronically filed and require original signatures other than that of the Filing User must be maintained in paper form by the Filing User until 5 years after all time periods for appeals expire.  On request of the court, the Filing User must provide original documents for review.[62]

Weekes argues that he complied with this Local Rule because he retained both the Debtor's original ink signature and the Debtor's electronic Adobe Sign signature. Weekes references Utah District Court Rule 5.1(a), which expressly allows electronic signatures: "Papers may be filed, signed, and verified by electronic means consistent with the administrative procedures adopted by the court. . . ."  Weekes also cites to  Fed. R. Evid. 1001(d), which states:

> (d) An "original" of a writing or recording means the writing or recording itself or any counterpart intended to have the same effect by the person who executed or issued it. For electronically stored information, "original" means any printout—or other output readable by sight—if it accurately reflects the information.

Further, Weekes notes that in 2000, Utah adopted the Uniform Electronic Transactions Act,[63] which provides as follows:

---

[61] *See* Fed. R. Bankr. P. 5005(a)(2).

[62] *See* Bankr. D. Ut. LBR 5005-2(e) (2014).

[63] UTAH CODE ANN. § 46-4-201.

Case 16-30883    Doc 151    Filed 04/04/19    Entered 04/04/19 10:16:01    Desc Main
Document    Page 25 of 27

Legal Recognition of Electronic Records, Electronic Signatures, and Electronic Contracts.

> (1)  A record or signature may not be denied legal effect or enforceability solely because it is in electronic form.

> (2)  A contract may not be denied legal effect or enforceability solely because an electronic record was used in its formation.

> (3) If a law requires a record to be in writing, an electronic record satisfies the law.

> (4) If a law requires a signature, an electronic signature satisfies the law.

Consequently, Weekes argues that e-signatures are broadly permitted in court proceedings as valid and binding signatures. He further argues that Local Rule 5005-2(e) should be read consistent with DUCivR 5.l(a) that allows e-signatures on court documents. Lastly, Weekes notes that the Local Rule does not expressly require the retention of holographic or "wet" signatures.

Based on these arguments, the Court finds that it was not unreasonable at the time of the Debtor's bankruptcy filing for Weekes to interpret the phrase "original signatures" in Local Rule 5005-2(e) as including e-signatures. Thus, Weekes' use of e-signatures in this case does not merit the imposition of sanctions.

Pending an amendment to Local Rule 5005-2(e), attorneys should continue to obtain and retain a party's holographic signature on court papers, and specifically as to a debtor's signature on the bankruptcy petition, the bankruptcy schedules, and the Statement of Financial Affairs. However, the Court is mindful of special circumstances where a debtor may need immediate bankruptcy relief, but it is not logistically possible for the debtor to holographically sign the

Case 16-30833   Doc 151-1   Filed 04/26/20   Entered 04/26/20 09:58:00   Exhibit A
Pg 26 of 27

bankruptcy papers before the petition is filed.[64] The Court will address these situations on a case-by-case basis.

## IV.     CONCLUSION

Under Fed. R. Civ. P. 56(a), as incorporated into bankruptcy proceedings by Fed. R. Bankr. P. 7056, the Court is required to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The parties do not dispute the facts as set forth herein. For the reasons stated above, the Court grants summary judgment in favor of Weekes and finds the following:

1.      The procedures and business practices of Capstone Law in this matter facilitated the Debtor's ability to retain and pay for legal counsel to guide the Debtor through the Chapter 7 process with sufficient competence to expeditiously obtain a Chapter 7 discharge.

2.      Weekes provided adequate explanations and disclosures of the Debtor's various options to seek bankruptcy relief, which options involved different levels of costs, services, and methods of payment.

3.      Based on the services provided by Weekes, the Debtor's financial circumstances at the time of the bankruptcy filing, and the Debtor's successful receipt of a discharge, the Court finds that the $2,400 fee charged by Weekes was reasonable.

4.      Consequently, there is no basis for the Court to impose sanctions on Weekes or Capstone Law, or to order Capstone Law to refund any portion of the payments received from the Debtor.

---

[64] For example, debtors residing outside of Utah's metropolitan areas may be hundreds of miles from the nearest bankruptcy attorney.

———ooo0ooo———

## **DESIGNATION OF PARTIES TO RECEIVE NOTICE**

Service of the foregoing **MEMORANDUM DECISION ON MOTION FOR SUMMARY JUDGMENT (DOCKET NO. 126)** shall be served to the parties and in the manner designated below.

     **By Electronic Service:** I certify that the parties of record in this case as identified below, are registered CM/ECF users:

- Leah J. Aston    lja@lincolnlaw.com
- Laurie A. Cayton tr    laurie.cayton@usdoj.gov, James.Gee@usdoj.gov;Lindsey.Huston@usdoj.gov;Suzanne.Verhaal@usdoj.gov
- Steven M. Rogers    srogers@roruss.com, nrussell@roruss.com;rorusslaw@gmail.com;paralegal@roruss.com
- Kenneth A. Rushton tr    KRus8416@aol.com, UT01@ecfcbis.com
- Tessa Meyer Santiago    tms@lincolnlaw.com, lincolnlaw.tms@gmail.com
- United States Trustee    USTPRegion19.SK.ECF@usdoj.gov
- Russell B. Weekes    ecf@capstonelaw.net

     **By U.S. Mail:** In addition to the parties of record receiving notice through the CM/ECF system, the following parties should be served notice pursuant to Fed. R. Civ. P. 5(b).

     None.